UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOY TERRELL SMITH, | No. C 05-3373 SI (pr) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |
| v. | |
| JEANNE WOODFORD; et al., | |
| Defendants. | |

**INTRODUCTION**

Toy Terrell Smith, a California prisoner, filed this pro se civil rights action under 42 U.S.C. § 1983, asserting an unusual claim for deliberate indifference to a prisoner's mental health needs. Smith seeks relief for being placed in the security housing unit ("SHU") for misconduct that he attributes to prison officials' refusal to care for his mental health needs and insistence that he double-cell. He claims he should not have been disciplined and instead should have been given mental health care and a single cell. The court earlier dismissed the claim against three defendants as time-barred, and the part of this action that remains for consideration concerns the liability of the corrections director and an assistant warden, neither of whom is a health care provider. The corrections director is sued for her alleged denial of Smith's inmate appeal and the assistant warden is sued for denying Smith's inmate appeal as well as for deciding to retain Smith in the SHU. Defendants now move for summary judgment on the grounds that Smith did not have a serious mental health need and they did not act with deliberate indifference. For the reasons discussed below, defendants' motion for summary judgment will be granted. Judgment will be entered in defendants' favor.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

At the time of the events alleged in the amended complaint, Smith was an inmate at Pelican Bay State Prison, serving a sentence of life with the possibility of parole on a conviction for attempted murder. Defendant Kirkland was the associate warden at Pelican Bay. Defendant Woodford was the director of the California Department of Corrections & Rehabilitation ("CDCR").

A.   Misconduct, Disciplinary Decisions, and Housing

Smith was a prisoner in Calipatria State Prison for part of 1999. While at Calipatria, his mental health was evaluated and a mental health placement form was completed on June 8, 1999. The form stated that Smith "meets inclusion criteria for the [mental health] treatment population" at the Correctional Clinical Case Management System ("CCCMS") level of care. Smith Declaration In Opposition To Defendants' Motion For Summary Judgment ("Smith Decl."), Exh. F.[1] In the portion of the form for "behavioral alerts," the psychologist wrote: "potential for violence above average due to suspiciousness of other inmates. Recommend 'single cell' at CAL. Recommend transfer to facility closer to family." Id. The form indicated that no psychotropic medications had been prescribed.

In September 1999, Calipatria prison officials decided to transfer Smith to a prison that had a CCCMS because Calipatria did not have it. See Smith Decl., ¶¶ 3-6, Exh. A. A committee at Calipatria recommended transfer consideration to Mule Creek State Prison or High Desert State Prison, both of which were CCCMS institutions and were considered to be within reasonable proximity of Smith's family. Shortly before his departure, Smith was informed that his transfer destination had been changed to Pelican Bay. While en route to Pelican Bay, he stopped at San Quentin for a 2-day layover that stretched into almost a month-long layover

---

[1] The form indicated that CCCMS was the lowest level of mental health care on the continuum. The choices were: "inpatient DMH," "mental health crisis bed," "enhanced outpatient program," and CCCMS.

because of a paperwork mix-up. On October 15, 1999, Smith had a physical altercation with a correctional officer at San Quentin; he was charged with assault on a peace officer and put in administrative segregation ("ad-seg") housing pending resolution of the disciplinary charge.

Smith was transferred to Pelican Bay on October 19, 1999. He remained in ad-seg because of the pending disciplinary charge. Smith states that he was seen "on several occasions by mental health specialist Doctor Beegle." Smith Decl., ¶. 14.[2] Smith states that during interviews with Beegle on unidentified dates, he was informed that he was "due to be prescribed adequate medication to help [his] thinking become more stable," that he would be retained on single cell status, and that he would receive routine counseling sessions and any other treatment deemed necessary. Id. at ¶ 15.

Smith appeared before a Pelican Bay ad-seg institutional classification committee ("ICC") on October 27, 1999 for initial review. That event was memorialized in a CDC-128.[3] Def. Exh. B. The CDC-128 stated that Smith had been put in ad-seg based on information from San Quentin that Smith had committed battery on a correctional officer by punching him and attempting to assault a responding officer. The CDC-128 stated that Smith was in the CCCMS and on single cell status due to a pending psychological evaluation. The CDC-128 stated that Smith was questioned regarding his current mental health status and "advised Committee he did not have Psych concerns at this time." Id. Smith had a 30-day ad seg review on November 24, 1999, at which it was noted that Smith was in the CCCMS and had informed the committee that he did not have any mental health problems at the time. Def. Exh. C.

Smith appeared for an ad-seg review on December 15, 1999 for the assault on the San Quentin officer. At that time, the ICC elected to assess an eighteen-month SHU term for assault on a non-inmate with insufficient force to cause serious injury. Def. Exh. D. The term was aggravated due to a similar CDC-115 (i.e., a rule violation report) dated October 8, 1998. Id. The CDC-128 noted that Smith also had other CDC-115s in his file for battery on staff,

---

[2]The medical records indicate (via a stamp) that Beegle was a licensed clinical social worker. See Def. Exh. H.

[3]A CDC-128 is the form used by California prisoners and staff for memoranda.

3

disobeying orders, assault on an inmate, mutual combat, and resisting staff. Id. The CDC-128 also stated that a record dated November 19, 1999 stated that Smith "does not meet the criteria for inclusion in the Mental Health Services System, and does not meet the PBSP-SHU exclusionary criteria. D. Mandel, Staff Psychologist, was present during this Committee's action." Def. Exh. D.[4] The CDC-128 also stated that Smith was assigned to single cell status "per ICC of 10/27/99, and today's Committee acts to reaffirm the single cell status." Id.

On December 16, 1999, a mental health placement/removal form was completed for Smith after a mental health risk assessment was done. The result was that Smith did "not meet court ordered at risk criteria for exclusion from SHU," and did "not meet criteria for inclusion in the mental health treatment population." Def. Exh. F. The form noted that Smith previously had been in CCCMS but had been assessed and now had no mental health needs.

On December 7, 2000, Smith went before a classification committee concerning his housing. Smith states that he told the committee that he needed mental health assistance due to being very depressed and unable to function. He was told that the single-cell "S" suffix would be removed and he would be required to share a cell. He filed an inmate appeal, the response to which was that the "S" suffix was removed based on the recommendation of a September 9, 2000 SHU committee decision that the "S" suffix should be removed once he was placed back in general population. Smith states that he talked to "doctor" Beegle and told him of his need for single-cell status and that the committee intended to take it away. Smith also states that Beegle told him that he was taken out of the mental health delivery system on December 16, 1999 because Pelican Bay administration wanted to put him in the SHU for the San Quentin assault but could not do so while he was in the mental health delivery system.[5]

---

[4] Smith agrees that he said he had no psychological issues. He explains in his opposition to the pending motion that his statement was due to him being in direct communication with doctors on a regular basis and his belief that his health issues were going to be met. Smith Decl., ¶ 18. He provides no evidence that this explanation was in the file that defendants eventually reviewed on the inmate appeal.

[5] A prisoner in the CCCMS is not automatically excluded from the SHU. Def. Request For Jud. Notice, Exh. A; Def. Exhs. M, N. Prisoners in the SHU have access to mental health staff.

4

Smith pleaded with prison officials that he needed a single cell, but prison officials nonetheless put him on double cell status. Smith initially refused accepting a cell mate, but then was told that receiving a disciplinary rule violation report for refusing an order to double-cell would reflect negatively on him at his parole consideration hearing in June 2001. Prison officials also told him his privileges would be discontinued. On February 13, 2001, Smith's television apparently was confiscated for refusing to voluntarily double cell. He gave in, and attempted to double-cell on April 11, 2001.

Smith was in a cell fight on April 11, 2001 during the course of which he "bit off a large piece of the other inmate's ear." Amended Complaint, p. 8. Smith also was hurt: he was bitten in the nose and received a fingernail to the eye. Smith attributes the fight to his untreated mental health needs. As a result of the cell fight, a CDC-115 was issued to him. (Eventually, a disciplinary hearing was held for Smith. Smith offered up his mental health defense and was found guilty. Smith received a 24-month SHU term as discipline for the cell fight.)

Smith appeared before the ICC on April 18, 2001 for an initial review following his placement in ad-seg on April 11, 2001 pending resolution of the disciplinary charge for the ear-biting incident. Def. Exh. J. The CDC-128 noted that there was a November 19, 1999 CDC-128 that denoted no level of care and that Smith did not meet the SHU exclusionary criteria. A social worker was present during the committee review. The CDC-128 stated that, when asked about his current mental health status, Smith advised the committee "he did not have Psych concerns at this time." Id. The CDC-128 also stated that Smith was currently single-celled due to the seriousness of the in-cell assault, and that the committee designated him for single-cell status.

A 30-day ad-seg review was done by the ICC on May 9, 2001. The CDC-128 stated that Smith was free of mental health services needs, and that a September 20, 2000 CDC-128 indicated no level of care and that he did not meet SHU exclusionary criteria. Def. Exh. L. There also was a separate form dated May 9, 2001 by a psychologist who checked the boxes to reflect that Smith had no mental health services treatment needs at that time, did not meet the criteria for inclusion in the mental health services delivery system and did not meet the criteria for exclusion from Pelican Bay's SHU. Def. Exh. M. A form dated June 18, 2001 indicated that

Smith's mental health records had been evaluated and he was cleared for housing in Pelican Bay's SHU. Def. Exh. N.

On December 4, 2002, Smith appeared before the ICC for a pre-MERD review[6] and ad-seg initial review. Defendant Kirkland was the chairperson at the hearing. At this hearing, the ICC recommended that Smith be kept in the SHU on an indeterminate basis "due to his long history of aggression and physical batteries on inmates and staff." The CDC noted that Smith's file indicated six SHU terms from 1991-2002 and met the criteria for an indeterminate term. Def. Exh. O. The CDC-128 noted that the documents in the file, including a CDC-128 dated June 18, 2001 denoted no level of mental health care and that Smith did not meet the criteria for exclusion from the SHU. When asked about his current mental health, Smith stated "he did not have Psych concerns at this time." Id. The form also indicated that the committee decided to retain him on single-cell status.

B.     The Inmate Appeal

Smith filed an inmate appeal (log no. D03-01741) dated June 20, 2003. Def. Exh. P. He requested that (a) all CDC-115s on and after September 24, 1999 be dismissed and removed from his prison file and (b) he be placed "back into a level IV (270 design) prison facility that provides 'CCCMS' health care and 'preferably' is a facility that suits the needs of inmates who wish to program productively and positively." Id. at 1. He discussed the mental illness aspects to his misbehavior, i.e., that he had originally been sent to Pelican Bay for "the sole purpose of receiving mental health treatment including needs of single cell housing," that he had wrongfully been removed from the mental health delivery system, and forced to double-cell even though "he did not have the mental capacity to deal with a cellmate as supported by previous psychologic recommendations." Amended Complaint, p. 4. Smith argued that, had he not been taken out of the mental health delivery system and instead been allowed to begin the process of dealing with his mental illness as recommended by a mental health specialist, the cell fight would not

---

[6]The per-MERD review apparently pertained to the minimum eligible release date from the SHU on the determinate SHU term for the ear-biting incident.

6

have occurred. Id. at 4-5. Smith asserted that the indeterminate SHU term after he completed the disciplinary SHU term of two years "did not suit the circumstances considering the plaintiff was in need of mental health treatment." Id. at 5.

The inmate appeal was denied at the first level on July 29, 2003. The reviewer wrote that the appeal discussed many issues, most of which had already been addressed or rejected by the appeals office. Def. Exh. P, Id. at 5. The reviewer chose to address the issue of Smith's continued indeterminate retention in the SHU. The reviewer wrote that the matter had been investigated and Smith's file reviewed. "In reviewing your retention on SHU Indeterminate disciplinary status, it [too] is completely appropriate and has been reviewed and endorsed by a Classification Staff Representative who thoroughly reviewed your case before endorsing the Indeterminate Status." Id.

Smith pursued the appeal to the second (warden's) level. On the appeal form he stated that he was dissatisfied with the response. He disagreed with the assessment that most of his issues had already been through the appeal process. Id. at 4.

Defendant Kirkland signed the second level review decision that denied Smith's appeal on August 26, 2003. The determination of the issues stated:

> The inmate requests to be released to a 270-design General Population, allowing him to participate in the Correctional Clinical Case Management Services. Although the inmate refused to participate in the Unit Classification Committee on May 15, 2003, the Committee members proceeded to evaluate his indeterminate status. Based upon this review, the Committee members determined that due to the inmate's extensive history of assaultive behavior towards both staff and inmates, his retention in the Security Housing Unit on an indeterminate basis was warranted. Therefore, a determination has been made that the inmate is appropriately housed, and the APPEAL IS DENIED, as he has been deemed unsuitable for placement in a General Population at this time. Additionally, the inmate has requested that a disciplinary from 1999 be dismissed and all related documents removed from his Central File. However, he has exceeded the time limits that allowed him to pursue this matter in an Appeal, therefore, this issue is not being addressed. (Id. at 7.)

Smith appealed to the third (director's) level.

A director's level appeal decision on the appeal was issued on December 4, 2003. It was signed by T. Surges for N. Grannis, chief of inmate appeals branch. There is no evidence that defendant CDCR director Woodford had any personal involvement in the consideration of Smith's inmate appeal. The reviewer described Smith's argument as one that he should not have

7

been retained in the SHU on an indeterminate basis. "He explains the history of his transfers, prior mental health complaints, and multiple serious disciplinary actions, and attributes it all to a failure of staff to provide mental health care, single-cell housing, and proper placement." Id. at 8. The appeal was denied with this statement of findings:

> The appellant's appeal package includes an extensive history of his conduct, mental health claims, and positive achievements while in state prison. The CDC Form 128-G, Classification Chrono, dated December 4, 2002, captures a summary of the appellant's violent in-custody conduct that contributed to the decision to retain him in SHU on an indeterminate term. "Inmate Smith . . . is free of mental health needs, . . . is currently serving a SHU term for ASLT on I/M w/SBI. . . long history of aggression and physical batteries on inmates and staff. In 1991, there were two SHU terms for ASLT, and one ASLT without a SHU term. In 1998, there was one SHU term; in 1999, 3 terms; in 2001, one term. This adds up to 6 SHU terms from 1991-2002, meeting the criteria for an INDET term." The appellant's violent conduct requires continued SHU placement to protect the safety and security of the institution and those that live and work therein. (Id.)

C. Mental Health Records

Defendants presented Smith's mental health records, which included the following: A December 16, 1999 "mental health placement/removal" form stated that Smith had completed a mental health risk assessment with the result that he "does not meet court ordered at risk criteria for exclusion from SHU," and "does not meet criteria for inclusion in the mental health treatment population." Def. Exh. F. The form noted that Smith had been in CCCMS but that the treatment team's current level of care recommendation was that Smith had no mental health needs. "This inmate was initially designated as a Mental Health Treatment Population patient at a Reception Center or institution without a Mental Health Treatment Population program. Within the last 90 days the inmate has transferred to a Mental Health Treatment Population facility and a review of the inmate's Unit Health Record and assessment by the Interdisciplinary Treatment Team concludes the inmate does not meet the criteria for continued inclusion in the Mental Health Treatment Population." Id.

The mental health records also contain interdisciplinary progress notes from social worker W. Beegle, who wrote on December 19, 2000 that Smith had self-referred for a CCCMS interview. Beegle wrote that Smith had described his difficulties in having any cell mate, but that Smith "clearly stated he did not want mental health services," Def. Exh. G. Beegle also

8

wrote that Smith had "no Axis I" diagnosis, and that Beegle had observed Smith to be basically normal in mental processes. Finally, Beegle wrote that his plan was to review Smith's file regarding assaultive behavior and "no follow-up planned at this time." Id. Beegle also wrote interdisciplinary notes the next day that he had reviewed Smith's C-file, and that it reflected no mental health problems but did have two CDC-128s indicating that Smith should be considered for single cell status based on his propensity to be a danger to others and his antisocial personality. Beegle repeated that there was no Axis I diagnosis and no follow-up was planned.

The next entry in the progress notes was by A. Tagilaferri, Ph.D., who wrote on March 27, 2001 that Smith had self-referred because he wanted to talk. Def. Exh. I. Smith refused to talk to Dr. Tagilaferri, however, because he did not like that psychologist's care in 1999.

A progress note dated April 6, 2001 by Michelle Shine, Ph.D., the senior psychologist supervisor, cautioned that Smith may attempt to get secondary gain met by seeking a different clinician. She wrote that after the clinician saw Smith, the clinician should bring the file back for her review and then send it on to the interdisciplinary team for discussion.

A progress note by Dr. Shine on April 17, 2001 stated that Smith stated that he was removed from the mental health delivery system program after earlier meetings, although it had been helpful for him since June 1999. Dr. Shine noted that Smith's statement contradicted the records, which reflected that on three occasions in October - November 1999, Smith "was hostile, threatening (somewhat) and made it clear that he wanted nothing to do with the 3CMS program." Def. Exh. I. Dr. Shine wrote that Smith would be placed with another clinician, but that one should be "aware of this inmate's characterological disorder as a deeply entrenched-long-standing & pervasive antisocial personality." Id.

The mental health records also included a "refusal of examination and/or treatment" form indicating that Smith refused a mental health screening interview on May 3, 2001 because he did not want mental health services. The form was not signed by Smith, and instead had the "patient refuses to sign" box checked. Def. Exh. K. Smith denies that he ever told correctional or medical staff that he did not want to receive mental health care. Smith Decl., ¶ 32.

Smith had a psychiatric evaluation in connection with his September 2003 parole

consideration. The psychiatric evaluation report dated August 13, 2003 concluded that "Smith, by records and this interview, has no mental illness." Def. Exh. Q, p. 4. The evaluator noted the assaultive history in Smith's records, and recommended that Smith study and work on anger management skill development. "No further recommendations of a psychiatric nature can be made at this time. Decisions regarding program placements or release should be based on custody rather than psychiatric factors." Id.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, when a party challenges the merits of the opponent's claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond

the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The amended complaint is considered in deciding the summary judgment motion because it was made under penalty of perjury.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

## DISCUSSION

A. Summary Judgment Motion

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 102-04 (1975). Prisoners' mental health needs are among the medical needs covered by the Eighth Amendment. See Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994); see also Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) (mental health care requirements analyzed as part of general health care requirements). To prove that the response of prison officials to a prisoner's mental health needs was constitutionally deficient, the prisoner must establish (1) a serious mental health need and (2) deliberate indifference to that need by prison

11

officials. See McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). The subjective prong standard is the same for the mental health needs claim as for the safety claim: a prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. See Farmer v. Brennan, 511 U.S. 825, 837, 844 (1994).

### 1. Serious Mental Health Need

Defining a "serious mental health need" for Eighth Amendment purposes is quite difficult. The mental health need must be similar to a serious medical need, i.e., such a need exists "if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' (Citation.) The 'routine discomfort' that results from incarceration and which is 'part of the penalty that criminal offenders pay for their offenses against society' does not constitute a 'serious' medical need." Doty, 37 F.3d at 546 (citations omitted). In Doty, the prisoner's nausea, shakes, headache and depressed appetite due to unresolved family situational stress were "mild stress-related ailments" of the type of routine discomfort that results from incarceration and family separation and did not rise to the level of a constitutional concern. Id. For there to be a serious medical need regarding mental health, there must be "an ailment of a greater magnitude or with a cause separate from confinement." Id.; see, e.g., Capps v. Atiyeh, 559 F. Supp. 894, 916 (D. Ore. 1983) ("It is safe to say that the inmates must show, at a minimum, that they suffer from illnesses such as acute depression, paranoid schizophrenia, psychoses, or nervous collapse. . . . The eighth amendment does not require the State to solve inmates' behavioral, emotional, and personality problems.")

It is a close call as to whether a genuine issue of fact has been raised as to the existence of a serious mental health need. Defendants presented evidence that Pelican Bay mental health care providers had determined that Smith had no mental illness and did not require mental health care. Also, Smith does not identify with any particularity the nature of his serious mental illness.

12

See, e.g., Smith Decl., ¶ 5 (his family suffered "strain" due to the death of his grandmother); Smith Decl., Exh. C (inmate appeal he wrote in May 1999 while he was still at Calipatria and wanted to be transferred closer to his family makes no mention of a need for mental health care but does mention "the frustration and stress" he was under and that he could not "continue to maintain [his] sense of reasoning upon receiving inadequate unjust responses"); Smith Decl., Exh. I (June 20, 2003 accommodation request form in which Smith describes his disability as "mental disability: unable to function properly in certain situations due to depression, anxiety, stress etc.," and states that "over the years I have had escalating problem with managing my anger").

However, three pieces of evidence combine to convince the court that a genuine issue of fact exists <u>on this prong</u> of the Eighth Amendment claim. First, Smith presented evidence that a psychologist at Calipatria determined that Smith belonged in the CCCMS and that was the very reason for his transfer to Pelican Bay. Second, Smith presented evidence that social worker Beegle made statements indicating that he was receiving ongoing care. See Smith Decl., ¶ 15. Third, the sheer outrageousness of biting off a piece of someone's ear might suggest the existence of a mental illness in the biter. Although it is close, there is a genuine issue of fact whether Smith had a serious mental illness. Finding a genuine issue on the first prong of the Eighth Amendment analysis does not mean that Smith prevails, but only advances the analysis to the second prong.

2. <u>Deliberate Indifference</u>

Defendants have met their burden on summary judgment of showing the absence of evidence that they acted with the deliberate indifference necessary for an Eighth Amendment claim. Even viewing the evidence in the light most favorable to Smith (as the non-movant), no reasonable juror could conclude that either defendant knew that Smith faced a substantial risk of serious harm and disregarded it.

Defendants presented overwhelming evidence that Pelican Bay mental health care

providers determined that Smith did not have a mental illness and did not require mental health care after they met with Smith, reviewed his custody file and medical file on numerous occasions. A December 16, 1999 mental health assessment stated that Smith did not meet the criteria for continued inclusion in the mental health treatment population; a progress note by social worker Beegle dated December 20-21, 2000 stated that Smith had no major mental illness or Axis I diagnosis; Dr. Johnson's May 9, 2001 note stated that no treatment was needed; social worker Costiloe determined on June 18, 2001 that Smith did not exhibit any symptoms of a myriad of psychological disorders; and social worker Costiloe determined on August 13, 2003 that Smith had no mental illness.

In addition to the foregoing evidence in Smith's file that mental health staff had determined that Smith did <u>not</u> need mental health care, there was other evidence that Smith did not have an unmet serious mental health need. The CDC-128s for several hearings stated that Smith said he did not have mental health concerns. Smith argues that those statements are taken out of context and that he meant only that he was mentally able to participate in the hearings, but offers no evidence that his explanation of his intent was known to defendants. Also, there was a form that indicated Smith had refused to have a mental health screening on May 3, 2001 and progress notes that stated he had declined to have any mental health care. Smith denies that he ever refused treatment, but the file available to defendants did not include Smith's denials.

There is no evidence that the defendants were health care providers. A prison official, faced with an inmate's assertion that he has a need for mental health care but also faced with records that show that mental health care providers have recently examined the inmate and determined that the inmate does not have a mental illness, may rely on the mental health care providers' opinions. The prison officials do not act with deliberate indifference in not ordering mental health care for an inmate (or not recognizing a mental illness) when the health care providers have given their professional medical opinion that he does not need mental health care (and does not have a mental illness). Administrators and custodial staff are in no position to provide mental health care, and instead must turn to the mental health care staff to provide it.

14

Similarly, they may rely on mental health care staff's assessment of the absence of a mental illness or need for mental health care. Defendants' reliance on the recent information provided by the mental health staff in responding to Smith's inmate appeals did not amount to deliberate indifference.

The evidence that showed a genuine issue of fact on the first prong does not do so for the second prong. Smith's evidence of his discussions with social worker Beegle does not create a triable issue of fact on the deliberate indifference issue because he presents no evidence that defendants knew of those statements – defendants could not consciously disregard that which they did not know. He does not dispute that Beegle's written progress notes stated that Smith did not have a mental illness diagnosis and had basically normal mental processes. Smith's evidence that a psychologist at Calipatria thought he belonged in the CCCMS does not raise a triable issue of fact because of the more recent evaluations and opinions of other mental health care staff to the contrary. The Calipatria psychologist's opinion shows, at most, a difference of opinion, but a mere difference of opinion among mental health care providers does not show deliberate indifference by prison officials who credit one opinion over the other. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). And the evidence that Smith had bitten another person's ear does not raise a triable issue of fact as to whether defendants acted with deliberate indifference because his conduct was only part of the picture – defendants also had numerous evaluations by mental health professionals who opined that Smith did not have a mental illness or need mental health care.

Smith also has failed to show a triable issue of fact in support of his claim that defendant Kirkland acted with deliberate indifference when he chaired the committee that determined in December 2002 to keep Smith in the SHU on an indeterminate basis due to his disciplinary history. Smith admits that he denied he had "psych concerns." And he does not dispute that the prison officials were mindful of inmates' mental health issues as they made housing decisions. Someone from the mental health department was present at many of the committee meetings including the December 2002 meeting. And the CDC-128 correctly documented that Smith was

15

not in the CCCMS or subject to exclusion from the SHU. The consideration of Smith's mental health concerns supports a finding that the Eighth Amendment was not violated by the discipline imposed. Cf. Hallett v. Morgan, 296 F.3d 732, 746-47 (9th Cir. 2002) (Eighth Amendment not violated by imposition of minor sanctions designed to deter dangerous behavior, where sanctions were often cleared through the prison psychiatrist before imposition and were subject to requirement that the hearing officer consider the inmate's mental health and effect of sanction).

Prison officials considered and rejected Smith's argument that his misconduct should be excused or mitigated due to his mental health concerns. Smith has not identified, and the court is not aware of any, authority for the proposition that prison officials are constitutionally required to accept mental illness of an unidentified sort as a defense to a disciplinary charge. Further, regardless of whether it was attributable to a mental illness, Smith does not dispute that the underlying conduct occurred: he did bite off a large piece of another inmate's ear, he did physically attack a correctional officer at San Quentin, and he apparently did commit the several other assaults listed in support of the decision to keep him in ad-seg on an indeterminate basis. Determining that Smith had to be put in segregated housing because he posed a physical danger to other inmates and staff did not amount to cruel and unusual punishment. Smith also wanted the prison officials to wipe clean his disciplinary record, but omitting information about his assaultive conduct would have deprived parole authorities of highly relevant information about the parole candidate's dangerousness. Smith has failed to raise a triable issue of fact that defendants acted with deliberate indifference in considering his inmate appeal.

Smith's claim against defendant Woodford fails for the additional reason that he has not provided any competent evidence that Woodford personally decided his inmate appeal, did any act that had caused the alleged constitutional violation, or knew that her subordinates were violating Smith's constitutional rights. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

Smith has failed to show that there is a triable issue of fact on the deliberate indifference element of his Eighth Amendment claim. Defendants are entitled to judgment as a matter of law on the merits of the Eighth Amendment claim. Defendants also are entitled to judgment as a

matter of law on the defense of qualified immunity because there was no constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

B.   The Amendment To The Amended Complaint

Smith filed an "additional amendment to initial amended complaint" on August 24, 2007. Defendants urge that the amendment should be rejected because Smith did not file a motion to amend and merely filed an amendment. Smith counters that the court permitted an amendment in its Order Of Partial Dismissal.

To resolve this problem, a bit of procedural history is necessary. In the Order Of Service and again in the Order Of Partial Dismissal, the court identified the claim stated against Woodford as being an Eighth Amendment claim based on her response to Smith's administrative appeal.[7] However, in opposing the motion to dismiss, Smith had attempted to add an additional theory of liability against Woodford. The court noted that Smith hadn't alleged such a theory in his complaint and therefore permitted him to file an amendment to allege that theory:

> Smith argues in his opposition to the motion to dismiss that he also alleged that Woodford was liable on a theory that she failed to "promulgate, foster and monitor polices that would ensure and protect prisoner's constitutional rights" and that resulted in a constitutional violation. Opposition, p. 7. Even with liberal construction, the amended complaint cannot reasonably be interpreted to allege a claim based on such a theory. Smith did allege that Woodford had various duties but, did not allege that she failed to fulfill these duties and that such failure caused a violation of his constitutional rights. See Amended Complaint, ¶ 5. Smith may, within thirty days, file an amendment to his amended complaint if he wants to try to allege this theory. (Order Of Partial Dismissal, p. 11.)

---

[7]As described at page 10 of the Order Of Partial Dismissal:

The pro se amended complaint alleges that Smith was informed by the prison appeals coordinator "that if he was dissatisfied with defendant Kirkland's response to his appeal then he must submit the appeal to the Director of the CDC (i.e., Jeanne Woodford) for a Director's level of review. [¶] On August 30, 2003, the plaintiff submitted his administrative appeal to the Director of the California Department of Corrections. The plaintiff requested placement back into the prison general population and into a program which helps inmates with mental health needs." Amended Complaint, ¶¶ 21-22. On December 8, 2003, Smith received the director's level response to his inmate appeal that denied the appeal. Id. at ¶ 23-24. Liberally construed, these allegations are sufficient to state a claim for relief against defendant Woodford. See Jett[ v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)].

17

The problem here is that the amendment filed by Smith was not the one permitted by the court. The amendment merely elaborated on the claim already pled in the amended complaint (i.e., that Woodford had not handled his inmate appeal properly), and did not allege the new claim (i.e., that Woodford failed to promulgate, foster and monitor policies) that Smith had alluded to in his opposition to the motion to dismiss and had caused the court to permit the amendment. Due to the fact that Smith's amendment was not within the scope of the amendment the court permitted, the court rejects his argument that leave of court was unnecessary.

Smith needed leave of court to further amend because he had already filed an amended complaint. See Fed. R. Civ. P. 15(a). The amendment will not be permitted because Smith failed to move for and obtain leave of court to file it. Further, the amendment appears to be legally unnecessary: Smith's amended complaint had already stated a claim for deliberate indifference based on Woodford's alleged handling of his appeal and that claim had already passed the initial screening under 28 U.S.C. § 1915A and withstood the motion to dismiss. The untimely, unexplained elaboration of the legally viable claim will not be permitted. The operative pleading remains the amended complaint.

## CONCLUSION

For the foregoing reasons, defendants Kirkland and Woodford are entitled to judgment as a matter of law on plaintiffs' amended complaint. Defendants' motion for summary judgment is GRANTED. (Docket # 29.) Judgment will be entered in favor of defendants and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: January 31, 2008

SUSAN ILLSTON
United States District Judge

18